GUISEPPI LOLLI, AS NEXT FRIEND OF ALGA LOLLI, AND IN HIS OWN BEHALF, RESPONDENT, v. CHARLES M. GRAY, APPELLANT.

Argued January 22, 1925—Decided March 16, 1925.

A physican and surgeon, in the absence of express contract, is only required to exercise the skill and care ordinarily possessed and exercised by others in the profession.

On appeal from the Supreme Court.

For the appellant, *Carr & Carroll.*

For the respondent, *Cole & Cole.*

The opinion of the court was delivered by

WALKER, CHANCELLOR. This was a suit by Alga Lolli, an infant twelve years old, by Guiseppi Lolli, her father and next friend, to recover damages from the defendant, Dr. Gray, for alleged improper diagnosis, and because he did not

exercise the knowledge and skill which he possessed as a physician in treating her, but was careless and negligent in the attention and treatment which he gave her, whereby she was permanently injured. The father, as usual, sued for his expenditures in endeavoring to have his daughter cured of her ailment. She recovered a verdict for $5,000, and her father and next friend one for $360. And from the judgment entered thereon, the defendant appeals to this court.

Alga fell over a stump and injured her left leg near the hip, her injury being known as a fractured femur. She was taken to the Vineland Hospital, and Dr. Gray was called to attend her. He diagnosed the case as a fractured femur and treated her accordingly. During her stay at the hospital her father suggested to Dr. Gray the calling of a specialist in consultation, but after being informd that he would have to pay for the specialist, the father said he had decided to take Alga to a hospital in Philadelphia, whereupon Dr. Gray informed him that if he took her out of the Vineland Hospital he would do so on his (the father's) responsibility. Dr. Gray prepared her for transference to the Philadelphia hospital. Instead of taking her there her father took her to his own home, a distance of five or six miles, in a small automobile over a gravel road which was poor and rough, and, consequently, injurious to the invalid. While in the hospital, under his care, Dr. Gray performed an operation on the child; put her under ether and made an incision in her leg, drawing the bones together with a silver wire and placing a drainage tube in the wound. A few days after the operation the patient involuntarily urinated one night and wet the bandage. Immediately thereafter he redressed the wound, taking off the soiled bandages, putting on clean, sterilized ones and using antiseptics. The child had never wet herself before, although she had been in the hospital twelve or fourteen days, and did not wet herself after that. She remained at home and out of the hospital for a week, and then, instead of being taken to a Philadelphia hospital, was returned to the one at Vineland. She had no medical attention at all for the first few days she was at home, after

which Dr. Giacalone was called in and ordered her to be returned to the Vineland Hospital the next day, but it was a few days later before she was actually returned. When she was removed from the hospital to her home her bones were in straight position and in apposition, but when Dr. Giacalone first saw her they were dislocated.

Passing over the details of the treatment, it is sufficient to say that the diagnosis proved to be correct, and that all the, medical testimony, and that of the nurses, was that the treatment of Dr. Gray was in accordance with standard medical and surgical practice.

The case on the argument seemed to narrow down to the question of whether Dr. Gray was negligent in not protecting the bandages on the injury with a rubber cloth to prevent infection from urination. It is true that Dr. Gray testified, "I should have used a rubber cloth over the dressings," but this answer must be read in connection with the question which elicited it, which was, "What would have been the means of guarding against such a thing *if it had been anticipated?*" The answer, therefore, meant, *"If I had anticipated* the girl wetting herself by urinating, *I should* have used a rubber cloth over the dressings." As the child did not wet herself by urination but once, and that was some twelve or fourteen days after she had been in the hospital, and several days after the operation, the doctor, doubtless, was not required to anticipate that she would do that thing. She was a child twelve years old and beyond the age when involuntary urination is apt to take place. Furthermore, the doctor testified: "*Q.* Is there a disadvantage in using that [rubber cloth] over bandages? *A.* Yes, sir. *Q.* Is it a considerable disadvantage? *A.* Yes, sir. *Q.* In the weighing of the probabilities, would a doctor provide, in every case, a rubber cloth, with whatever injury that might effect, against the chance that the child or person might involuntarily wet themselves in their sleep? *A.* No surgeon would." Dr. Silvers, for the defense, on cross-examination, was asked: "*Q.* Is there nothing yet known to medical science to be used to prevent a wound becoming infected by reason of one bed-

fast urinating? *A.* Except the use of clean sterile dressing—that is, gauze. *Q.* Couldn't you use rubber, too, around the gauze? *A.* Yes, but we are rather set against what we call an exclusive dressing, usually a dressing that is aerated, that allows the heat of the body to pass through it, is better than one that is closed and tight. *Q.* Then you don't use it? *A.* We don't like to use it, no." Even the testimony of Dr. Giacalone, plaintiff's sole expert witness, is consistent with proper treatment by Dr. Gray. He (Dr. Giacalone) said, among other things, that infection might occur without carelessness on the part of the doctor, that it might be in the air and drop right in.

At the close of plaintiff's case a motion was made to nonsuit on the ground that the standard requirement was only that a doctor exercise the usual care of a physician under the circumstances, and, so far as infection of the wound was concerned, that might have resulted from causes other than negligence. The judge said he would hold the motion. At the conclusion of the whole case a motion was made for the direction of a verdict for the defendant on the ground that no negligence had been shown on his part. The motion was denied and an exception noted for defendant.

The law applicable to the case at bar is entirely settled in this state. A resumé of it will be found in the opinion of Mr. Justice Katzenbach in the Supreme Court in *Smith* v. *Corrigan,* 100 *N. J. L.* 267, wherein it was held that the skill and care a physician is required to give a patient is that ordinarily possessed and exercised by others in the profession. At page 272, quoting from *Ely* v. *Wilbur,* 49 *N. J. L.* 685, is to be found a reference to *Ord. Med. Jur.,* wherein the rule is stated that a physician is not a guarantor without express contract of the good effects of his treatment, and he only undertakes to do what can ordinarily be done under similar circumstances; that if the good effects of his treatment and the consequent value of his services be disputed, he must be prepared to show that his labor was performed with the ordinary skill and in the ordinary manner of his profession, and that this is all the essential evidence upon which

to found his case. Now, there is no pretense of a contract to cure in the case at bar, and the proofs, both those offered by the plaintiff, as well as the defendant, bring the defendant's case entirely within the rule just stated.

The result reached is that the motion for a direction of a verdict for the defendant should have been granted, and that its refusal was error. This alone requires a reversal and renders it unnecessary to consider and decide the other questions raised by this appeal.

The judgment under review will be reversed to the end that a *venire de novo* may be awarded.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, BLACK, KATZENBACH, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, MCGLENNON, KAYS, JJ. 13.